STATE of Wisconsin, Plaintiff-Respondent,

v.

Steven A. AVERY, Defendant-Appellant.†

Court of Appeals

*No. 96–3027. Submitted on briefs July 22, 1997.—Decided September 3, 1997.*

(Also reported in 570 N.W.2d 573.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Stephen M. Glynn and Robert R. Hanak* of *Shellow, Shellow & Glynn, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *David J. Becker,* assistant attorney general.

Before Brown, Nettesheim and Anderson, JJ.

NETTESHEIM, J. Following a jury's verdicts of guilty, Steven A. Avery was convicted of first-degree sexual assault, attempted murder and false imprisonment. On appeal, Avery contends that the trial court erroneously denied his postconviction motion for a new trial on the grounds of newly-discovered evidence. Because the evidence does not create a reasonable probability that the result of a new trial would be different, we affirm the trial court's ruling.

Avery additionally contends that the trial court erroneously denied his supplemental postconviction motion for a new trial alleging that the State withheld exculpatory evidence involving another suspect. The trial court denied the motion without a hearing. We conclude that the facts set forth in Avery's motion, even if true, did not entitle him to relief. We affirm this further trial court ruling.

BACKGROUND

On July 29, 1985, P.B. was assaulted while she was jogging on a beach in Manitowoc county. P.B. identified Avery as her assailant. Avery was arrested and charged with first-degree sexual assault, attempted murder and false imprisonment. Avery was tried before a jury. P.B. was the sole identifying witness at trial. Although Avery presented alibi witnesses placing him elsewhere at the time of the assault, the jury found him guilty of all the charges and a judgment of conviction was entered against him.

Avery appealed his conviction, and this court affirmed. *See State v. Avery*, No. 86–1831-CR, unpublished op. (Wis. Ct. App. Aug. 5, 1987). On June 13, 1995, Avery's new attorney filed a motion with the trial court seeking the release of certain evidence for DNA testing stating that "DNA testing which excludes *both*

231

the victim and Mr. Avery would be highly significant new evidence indicating that the one-witness identification was inaccurate and that Mr. Avery's 16 alibi witnesses were correct." Avery argued that such evidence would form the basis for a motion for a new trial on the grounds of newly-discovered evidence pursuant to § 974.06, STATS. The trial court granted Avery's motion for release and testing of the evidence.

On April 23, 1996, Avery filed a motion for postconviction relief pursuant to § 974.06, STATS., requesting "an Order vacating the conviction and sentence in this matter and granting him a new trial on the grounds that evidence demonstrates a reasonable probability of a different result on retrial." Avery's motion, based on the DNA testing results, stated that the "DNA analysis of fingernail scrapings from the victim constitute newly-discovered evidence and reveal the presence of DNA which could not have come from either the victim or Mr. Avery" and that "such DNA most likely came from the perpetrator of this offense."

On July 29, 1996, Avery filed a supplemental motion for postconviction relief requesting "an Order vacating the conviction and sentence in this matter and granting him a new trial on the grounds that the state withheld material, exculpatory evidence at the time of trial." Avery's motion was based on his recent discovery that, prior to trial, the sheriff's department had failed to provide either Avery or Avery's trial counsel with information regarding an "alternative suspect living in Sheboygan County who matched the description of the perpetrator."

The trial court conducted a hearing on Avery's motion for a new trial on the basis of newly-discovered evidence. The expert who conducted the forensic DNA testing of the biological samples testified at length

regarding the DNA testing process and the results relevant to Avery's motion. In essence, the expert testified that there was DNA present in the scrapings taken from P.B.'s fingernails that did not match DNA samples from either Avery or P.B. Thus, "there [wa]s at least one additional individual present."

The trial court denied the motion for a new trial. The court compared in detail the newly-discovered evidence against the evidence presented at trial.. The court stated, "I conclude that [the DNA evidence] does not raise a reasonable probability of a different result as I view the evidence on both sides nor does it cause this Court to have doubt about the integrity of the first trial."

The trial court additionally denied without a hearing Avery's supplemental motion which claimed that the State had withheld exculpatory evidence concerning the alternative suspect. The court reasoned, in part, that the motion lacked the evidentiary underpinnings which would require a hearing on the issue.

Avery appeals. We will recite additional facts as they relate to the appellate issues.

DISCUSSION

Newly-discovered Evidence

■

Avery brought his motion for a new trial under § 974.06, STATS., which allows a trial court to grant a new trial after the time for appeal or postverdict remedy has expired. *See* § 974.06(1). A new trial may be granted under § 974.06 if "there has been such a denial or infringement of the constitutional rights of the person as to render the judgment vulnerable to collateral attack." Section 974.06(3)(d). "[D]ue process may

require granting a new trial under sec. 974.06, Stats., on the basis of evidence discovered after the time for bringing postverdict motions has passed." *State v. Bembenek*, 140 Wis. 2d 248, 252, 409 N.W.2d 432, 434 (Ct. App. 1987). However, the protection of a defendant's due process rights does not require a new trial unless the newly-discovered evidence meets, at a minimum, the following criteria:

> "(1)  The evidence must have come to the moving party's knowledge after a trial; (2) the moving party must not have been negligent in seeking to discover it; (3) the evidence must be material to the issue; (4) the testimony must not be merely cumulative to the testimony which was introduced at trial; and (5) it must be reasonably probable that a different result would be reached on a new trial."

*State v. Brunton*, 203 Wis. 2d 195, 200, 552 N.W.2d 452, 455 (Ct. App. 1996) (quoting *State v. Boyce*, 75 Wis. 2d 452, 457, 249 N.W.2d 758, 760 (1977)). If the newly-discovered evidence fails to meet any of these tests, the moving party is not entitled to a new trial. *See State v. Kaster*, 148 Wis. 2d 789, 801, 436 N.W.2d 891, 896 (Ct. App. 1989). Whether due process warrants a new trial on grounds of newly-discovered evidence is a constitutional question which we review de novo. *See Bembenek*, 140 Wis. 2d at 252, 409 N.W.2d at 434.

We begin by noting that the State does not dispute that the DNA evidence meets the first four criteria for a new trial based on newly-discovered evidence. However, the State argues on appeal that the trial court correctly found that the DNA evidence does not meet the fifth criterion—that there be a reasonable probability that a new trial will reach a different

result. Avery contends that the new evidence does satisfy this criterion. His argument is based on his contention that this criterion does not require that he show a reasonable probability of a different result, but rather a reasonable probability sufficient to undermine confidence in the outcome. He also contends that the trial court's application of the "clear and convincing" burden of proof as to this criterion was improper because the facts of this case are undisputed.

We must answer each of these threshold questions before we can assess whether the newly-discovered evidence entitled Avery to a new trial.

### 1. *Burden of Proof*

We first address Avery's burden of proof argument. Avery argues that the trial court operated under the "legal misconception" that "Avery must bear the burden of proving the likelihood of a different result by clear and convincing evidence." Avery concedes that this is the burden of proof in a case involving a newly-discovered evidence claim. *See Brunton,* 203 Wis. 2d at 198, 552 N.W.2d at 454. However, he argues that the burden of proof is an irrelevant consideration where, as in this case, the facts regarding the newly-discovered evidence are undisputed.

In support, Avery cites to the supreme court's language in *State v. Walberg,* 109 Wis. 2d 96, 104, 325 N.W.2d 687, 692 (1982):

> "The purpose of a standard of proof is to 'instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' " The burden of proof relates only to the proof of facts and has no application in cases involv-

ing undisputed facts. [Footnote omitted.] [Quoted sources omitted.]

However, Avery fails to note the supreme court's additional language in *Walberg* which brackets the above quote:

> However, this burden of proof was not critical to the present case because the determination of whether the trial court should have recused itself depends entirely on a review of undisputed statements contained in the record. . . . "When the principal facts and the only reasonable inferences are undisputed, as is true in the present case, this court is not bound by the findings of fact of the lower courts."

*Id.* (quoted source omitted). Taking this language in toto and read in proper context, it is clear that the supreme court was saying that burden of proof considerations are of no consequence *for purposes of appellate review* when the facts are undisputed.

The fallacy of Avery's argument is more clearly demonstrated when we apply it to a criminal trial where the parties submit stipulated or undisputed facts to the trial court or the jury. Avery's argument would hold that the fact finder need not be satisfied that those undisputed facts satisfy the "beyond a reasonable doubt" standard of proof. That clearly would be contrary to the law. A fact finder does not operate in a vacuum. Rather, the fact finder necessarily needs a standard by which to measure whether certain facts warrant the relief sought (i.e., is the defendant guilty; was the defendant negligent; did the defendant make a representation; or, as in this case, has the defendant shown the reasonable probability of a different result at a trial). If this burden is met, the fact finder then has

"the degree of confidence" to warrant the "particular type of adjudication." *See id.*

■

The importance and usefulness of the burden of proof is revealed by the trial court's words when making its ruling: "[T]he defendant has the burden in these proceedings. What is the burden? Well, it's to produce evidence of clear, satisfactory and convincing nature that if that evidence were to be considered by a jury it would or could possibly lead to a different result." We conclude that the trial court did not err in applying the "clear and convincing" burden of proof standard to the undisputed facts of this case.

### 2. *"Reasonable Probability"*

Having established the correct burden of proof, we next address the correct test under the fifth criterion for newly-discovered evidence. Again, this criterion requires the defendant to prove, by clear and convincing evidence, that it is " 'reasonably probable that a different result would be reached on a new trial.' " *See Brunton*, 203 Wis. 2d at 200, 552 N.W.2d at 455 (quoted source omitted).

Avery argues that this criterion requires him to establish only a probability sufficient to undermine confidence in the outcome. He contends that a newly-discovered evidence case is analogous to a due process violation for withholding exculpatory evidence and thus the proper test for "reasonable probability" is that set forth in *United States v. Bagley*, 473 U.S. 667, 682 (1985), where the Supreme Court stated that "[a] 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

The State counters that the "reasonably probable" standard to be applied in determining whether to grant

a new trial on grounds of newly-discovered evidence is not the same as the "reasonable probability" standard to be applied when a prosecutor has withheld exculpatory evidence. Instead, the State argues that the fifth criterion requires Avery to demonstrate exactly what the phrase recites: a reasonable probability that a new trial will reach a different result.

Besides *Bagley*'s statement that reasonable probability means only that the defendant must show a probability "sufficient to undermine confidence in the outcome," *see id.,* Avery additionally cites to the following language from *Kyles v. Whitley,* 514 U.S. 419, 434 (1995):

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley,* 473 U.S. at 678 [ ].

Although, both *Bagley* and *Kyles* adopt the definition of "reasonable probability" for which Avery argues, both cases did so in the context of withholding exculpatory evidence. Neither case purports to govern the case here in which the newly-discovered evidence has not been withheld by the State.

In fact, *Bagley* supports the State's argument because it explains why the less stringent test applies in exculpatory evidence cases as compared to newly-discovered evidence cases. In doing so, the *Bagley* court turned to its earlier decision in *United States v. Agurs,*

427 U.S. 97 (1976). *See Bagley*, 473 U.S. at 678. In *Agurs*, the Court considered the standard of materiality which gives rise to the prosecutor's constitutional duty to volunteer exculpatory matter to the defense. *See Agurs*, 427 U.S. at 107. In doing so, it stated that:

> [T]he fact that such evidence was available to the prosecutor and not submitted to the defense *places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal.* If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.

*See id.* at 111 (footnote omitted) (emphasis added). The *Bagley* Court reiterated this language in support of its conclusion that "[t]he standard of materiality applicable in the absence of a specific Brady request is . . . more lenient to the defense than the newly-discovered-evidence standard." *See Bagley*, 473 U.S. at 680–81. Thus, *Bagley* undercuts Avery's argument.

We also find support for our holding in *Strickland v. Washington*, 466 U.S. 668 (1984). There, the Supreme Court determined that the test for prejudice in an ineffective assistance of counsel setting "finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution" as set forth in *Agurs*. *See Strickland*, 466 U.S. at 694. This test was confirmed only after rejecting the standard

239

applied in cases of newly-discovered evidence. The Court stated:

> [W]e believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. This outcome-determinative standard has several strengths. It defines the relevant inquiry in a way familiar to courts, though the inquiry, as is inevitable, is anything but precise. The standard also reflects the profound importance of finality in criminal proceedings. Moreover, *it comports with the widely used standard for assessing motions for new trial based on newly discovered evidence.* Nevertheless, the standard is not quite appropriate.
>
> The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower.

*See id.* at 693–94 (emphasis added) (citations omitted).

In each of the above cases, the Supreme Court has expressly distinguished the standard of "reasonable probability" to be applied in situations of newly-discovered evidence from those of withholding exculpatory evidence and ineffective assistance of counsel. We conclude that Avery was obligated to establish, by clear and convincing evidence, that the newly-discovered

240

evidence created a reasonable probability that the out-
come would be different on retrial.[1]

---

[1] Since the parties briefed the issues in this case, the Wis-
consin Supreme Court has decided *State v. McCallum*, 208 Wis.
2d 463, 561 N.W.2d 707 (1997). There, the defendant sought to
withdraw his *Alford* plea based on newly-discovered evi-
dence—the victim's recantation. *See McCallum*, 208 Wis. 2d at
468, 561 N.W.2d at 708. The trial court had ruled that since the
victim's recantation was "less credible" than her original accu-
sation, the defendant had not shown the likelihood of a different
result at a trial. *See id.* at 472, 561 N.W.2d at 710. The supreme
court held that the trial court's conclusion that a different result
was not likely did not necessarily follow from the court's finding
that the recantation was less credible than her accusation. *See
id.* at 474, 561 N.W.2d at 711. The court stated, "The correct
legal standard when applying the 'reasonable probability of a
different outcome' criteria is whether there is a reasonable
probability that a jury, looking at both the accusation and the
recantation, would have a reasonable doubt as to the defen-
dant's guilt." *See id.*

We deem the supreme court's language in *McCallum* the
equivalent of the conventional test for newly-discovered evi-
dence which we have confirmed in this case. If there is a
reasonable probability that a jury would harbor a reasonable
doubt as to guilt, it follows that there exists a reasonable
probability of a different result.

Our interpretation of the *McCallum* language is supported
by Chief Justice Abrahamson's concurring opinion. Justice
Abrahamson notes that the courts have struggled with the test
for prejudice and that the test has resulted in various formula-
tions. *See id.* at 488–89, 561 N.W.2d at 717 (Abrahamson, C.J.,
concurring). Justice Abrahamson then argues for a gathering of
these various formulations into a single test which is the one
Avery urges:

> Reasonable probability for purposes of prejudicial error is not
> strictly outcome determinative. Reasonable probability does not
> mean that it is more likely than not that a new trial would produce

### 3. *The DNA evidence*

Having determined the proper burden of proof and the proper test for "reasonable probability," we now turn to Avery's claim that his newly-discovered evidence satisfied this test. A motion for a new trial based on newly-discovered evidence is addressed to the trial court's discretion. *See Brunton,* 203 Wis. 2d at 201–02, 552 N.W.2d at 456.

In support of his motion, Avery provided the trial court with the results of DNA testing establishing that the DNA in the fingernail scrapings from P.B. were "consistent with a mixture of DNA from P.B.[ ] and at least one other individual." The results also indicated that "Avery [ ] cannot be excluded as a possible contributor to this mixed sample, however, there are additional alleles present which could not have been contributed by either of these individuals." Thus, the DNA evidence showed a mixture of DNA under P.B.'s fingernails. Certain aspects of the DNA matched both P.B. and Avery. Other aspects matched neither P.B. nor Avery. Thus, Avery contends that the DNA results suggested the presence of a third party.

The trial court denied Avery's motion because the newly-discovered evidence did not exclude Avery and because the evidence at the trial and the postconviction hearing revealed various other innocent sources of the additional DNA.

Avery first points to his DNA expert testimony that a person's "normal day-to-day activity" can cause

a different result. . . . "[A] reasonable probability of a different outcome is one that raises a reasonable doubt about guilt, a 'probability sufficient to undermine confidence in the outcome' of the proceeding."

*See id.* at 490, 561 N.W.2d at 717 (quoted sources omitted). The *McCallum* majority, however, did not adopt this approach.

the removal of DNA material from underneath the fingernails. Specifically, the expert testified that washing one's hands would be the most likely cause of removal. Based on this testimony, Avery argues that P.B.'s activities of jogging and splashing in the water just prior to the attack likely removed any preexisting DNA sources from beneath her fingernails. Between the time of the assault and the completion of the medical examination at the hospital, Avery argues there were no likely incidents during which DNA could have been transferred.

However, the DNA expert also testified that genetic material can be deposited underneath one's fingernails during casual contact. Following P.B.'s assault, she felt unable to walk. She crawled to a nearby beach where she was assisted by a man and a woman. The woman gave P.B. a towel and helped P.B. cover herself with it. The man and woman then supported P.B. as they walked in the direction of the beach where P.B. had left her husband. When P.B. neared the beach, her husband approached, picked her up and carried her back towards the beach. P.B. was then transported, by ambulance, to the hospital. There she was tended to by emergency personnel and her personal physician. While P.B. was in the emergency room, a nurse took her fingernail scrapings.[2]

Even assuming that P.B. washed away any preexisting DNA prior to the attack, the State argues that a source of DNA, such as a "flake" of skin, could have

---

[2] We note that the parties dispute whether the nurse was wearing gloves when she took the fingernail scrapings. Although she testified that she was not wearing gloves when she took P.B.'s hair samples, she did not testify as to whether she was wearing gloves when the fingernail scrapings were taken.

been deposited under P.B.'s fingernails during any one of her "casual contacts" with the towel, the man and woman who assisted her, her husband and hospital personnel. Thus, the State reasons that the unidentified DNA found after the attack could belong to any number of innocent sources—not just the perpetrator. As such, the State contends that "the DNA testing which excluded the defendant and the victim as the source of the DNA, really does not have much probative force in excluding the defendant as the assailant."

We agree with the State. As the trial court correctly observed, the DNA evidence did not exclude Avery. As a result, this evidence if used at a trial would invite a fact finder to speculate about various possible sources of the DNA. And much of this speculation would focus on those who assisted and treated P.B. after the assault—persons who clearly did not assault P.B. In short, the DNA evidence does not make it any more or less probable that Avery assaulted P.B.

In assessing the question of a different result, we also look to the evidence presented at the trial. P.B. was the sole eyewitness against Avery. On the night of the assault, she recognized Avery "immediately" in a photographic lineup. Three days later, she recognized Avery "immediately" in a live lineup. P.B. testified at trial that as Avery walked her into the woods where he assaulted her, she remembered thinking, "I have to stay calm and get a good look at this guy." Once in the woods, P.B. testified that she had an opportunity "to get a very good closeup look at his face." P.B. gave a description of her assailant while in the emergency room. She additionally testified regarding the detailed description she gave to a deputy who drew a picture of her assailant, stating, "It's as if I have a photograph in my mind."

Avery argues that this was an "extremely close case" and the verdict is of questionable validity. In support of his argument, Avery points out that P.B.'s initial description of the perpetrator did not match Avery in two respects. First, because P.B. stated that Avery had brown eyes when in fact he has blue. Second, because P.B. stated that her assailant wore underwear. Both Avery and his wife testified that he did not wear underwear or own any underwear. Although whether Avery owned or wore underwear presents an issue of credibility, it is undisputed that Avery's eyes are indeed blue. However, P.B. addressed this discrepancy during her testimony at trial. She stated that although she had initially told the police that her assailant had brown eyes, she realized when she identified him in a photograph that she was "mistaken." Avery does not raise any other questions as to the veracity of P.B.'s testimony.

In his own defense, Avery testified that he could not have been at the scene of the assault at the time it occurred. He presented numerous witnesses who testified in support of this claim. According to Avery's family, he was assisting in a cementing project at his father's house just prior to the time the incident occurred. However, as the State's brief points out, the testimony of Avery and his alibi witnesses was impeached in numerous ways. In addition, at the postverdict motion hearing, the trial court recalled the "powerful" evidence that Avery referred to the victim as a female prior to being told the gender of the victim by the police. Despite the number of Avery's alibi witnesses, we do not view this case as "extremely close."

██

Under the facts of this case, we agree with the trial court's conclusion that the presence of DNA from an

unidentified third party did not create a reasonable probability of a different result on retrial. We conclude that the trial court did not misuse its discretion by denying Avery's motion for a new trial on grounds of newly-discovered evidence.

## *Exculpatory Evidence*

Avery filed a supplemental motion for postconviction relief pursuant to § 974.06, STATS., on grounds that the State withheld exculpatory evidence at the time of trial. Avery's counsel alleged that he had just recently learned that "the Sheriff's Department had identified an alternative suspect living in Sheboygan County who matched the description of the perpetrator, but failed to provide that information either to Mr. Avery's trial counsel or to Mr. Avery's counsel on the initial appeal." With his motion, Avery submitted a copy of trial counsel's motion for discovery, motion for exculpatory evidence and affidavits.

When a defendant raises a motion pursuant to § 974.06, STATS., the trial court must grant a prompt hearing unless the motion and the files and records of the action conclusively show that the person is not entitled to relief. *See* § 974.06(3). If the motion alleges facts which, if true, would entitle the defendant to relief, the defendant is entitled to an evidentiary hearing. *See State v. Carter*, 131 Wis. 2d 69, 78, 389 N.W.2d 1, 4 (1986). Whether the defendant's motion alleges facts entitling the defendant to relief is a question of law which we review independent of the trial court. *See State v. Bentley*, 201 Wis. 2d 303, 310, 548 N.W.2d 50, 53 (1996).

Avery's motion was accompanied by an affidavit of his attorney recounting a conversation he had with Leo

246

Jadowski, a deputy from the Manitowoc County Sheriff's Department. The facts alleged in the affidavit were as follows:

> a. At the time this case was investigated and tried in 1985, Mr. Jadowski was a deputy in the Manitowoc County Sheriff's Department.
>
> b. Although Mr. Jadowski was not directly involved in the investigation of this case, he spoke about the matter with Lieutenant James Gospodarek of the Manitowoc County Sheriff's Department, who was so involved. Lieutenant Gospodarek stated to Mr. Jadowski that he was aware of a man in Sheboygan County who matched the description of the perpetrator provided in this matter. Mr. Jadowski does not remember the name of the person Lieutenant Gospodarek referred to.
>
> c. Based upon Lieutenant Gospodarek's statements, Mr. Jadowski was under the impression that the man from Sheboygan County was under investigation with regard to this case. From his years of experience in law enforcement, Mr. Jadowski states that an officer normally should and will conduct an investigation when he or she possesses such information.

Avery's counsel then stated that this information was not included in the file provided him by Avery's counsel on direct appeal, nor was there any reference to the alternative suspect in the investigative files.

The State first argues that Avery is precluded from raising the exculpatory evidence issue under *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 184–85, 517 N.W.2d 157, 163 (1994), because he did not provide the trial court with a sufficient reason for failing to raise the issue on direct appeal. However, based on the record before us, we see no indication that the State raised an *Escalona-Naranjo* objection to the court dur-

ing the postconviction motion hearings. We are reluctant to invoke waiver against Avery under *Escalona-Naranjo* when the State itself failed to assert the *Escalona-Naranjo* argument in the trial court. If the State had done so, Avery could then have addressed this argument. In this "waiver-waiver" situation, we reject the State's *Escalona-Naranjo* argument.

■

As to the merits, the State contends that the trial court properly denied Avery's request for a hearing because his supplemental motion failed to allege facts which, if true, would entitle him to a hearing. The State contends that the evidence does not meet the *Bagley* test for materiality of exculpatory evidence:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*See Bagley*, 473 U.S. at 682. If the evidence fails to meet this test, the defendant is not entitled to a new trial. We conclude that the facts as alleged in Avery's motion are far too vague to demonstrate that Avery would be entitled to a new trial. Stated differently, Avery's facts, taken as true, do not demonstrate "a probability sufficient to undermine confidence in the outcome." *See id.*

■

Before a defendant may introduce evidence that a third person may have committed a crime, the defendant must satisfy the "legitimate tendency" test. *See State v. Denny*, 120 Wis. 2d 614, 622–25, 357 N.W.2d 12, 16–17 (Ct. App. 1984). This requires the defendant to offer proof of motive, opportunity and a direct con-

nection between the third party and the crime. *See id.* at 625, 357 N.W.2d at 17. Evidence that simply affords a possible ground of suspicion against another person should not be admissible. *See id.* at 623, 357 N.W.2d at 17.

The facts alleged in Avery's motion, if true, fail to satisfy either the materiality requirement of *Bagley* or the "legitimate tendency" test of *Denny*. Avery's motion states only that a Manitowoc county lieutenant, at some point during the investigation, was informed that a person in Sheboygan county matched P.B's description of her assailant. Certainly, the exchange of information regarding possible suspects occurs frequently between police officers and police agencies during an investigation. Such routine communications are not exculpatory evidence unless, or until, they mature into evidence material to guilt or punishment. *See Bagley*, 473 U.S. at 682; *State v. Garrity*, 161 Wis. 2d 842, 848, 469 N.W.2d 219, 221 (Ct. App. 1991). Taking all of Avery's facts as true, they fail this test. The trial court did not err in denying Avery's request for a hearing on his motion.

CONCLUSION

We hold that the trial court properly applied the "clear and convincing" burden of proof to Avery's newly-discovered evidence. We further hold that the trial court applied the proper test by requiring Avery to show a reasonable probability of a different result at trial. We affirm the court's ultimate finding that the DNA testing did not satisfy this test. Finally, we conclude that the trial court properly denied Avery's supplemental motion for postconviction relief without an evidentiary hearing because Avery's motion failed to allege facts which, if true, would entitle him to relief.

*By the Court.*—Order affirmed.